WILLIAM CARSON and HENRY EATON, Appellants, *vs.* ORRIN SMITH and SYLVESTER J. SMITH, Respondents.

#### APPEAL FROM THE DISTRICT COURT OF WINONA COUNTY.

The statute providing for the appointment of Referees (*p.* 563,) is not an infringement of the Constitution, (*Art. 6, Sec.* 1) which vests the judicial power of the State in the Courts therein named. They are mere auxiliaries or officers of the Courts already established.

A power of attorney authorized the agent to "enter into and take possession of all such lands, &c., in the county of Fillmore, Minnesota Territory, to, or in which I am, or may be in any way entitled." The power was executed on the 8d day of October, 1853, at which time the land in Fillmore county was unsurveyed, and the principal who executed the power resided in Illinois. *Held,* That he might then have owned an interest in such lands, at that time, inchoate, but valuable; the conveyance of which interest, duly recorded, would be notice to subsequent purchasers.

A power authorized an agent "to grant, bargain and sell the land, or any part or parcel thereof, for such sum or price, and on such terms as to him shall seem meet, and for me and in my name execute, acknowledge and deliver good and sufficient deeds and conveyances for the same, with or without covenants and warranty." *Held,* That the agent was authorized to sell on a reasonable credit, and to receive payment of the purchase money. That he could sell upon other valuable consideration than money, and that he could sell an undivided interest in the property. The extent of a power is to be settled by the language employed in the whole instrument, aided by the situation of the parties and of the property, the usages of the country on such subjects, the acts of the parties themselves, and any other circumstances having a legal bearing, and throwing light on the question.

Points and authorities of Appellant:

*First.*—The referee, who summarily disposed of this case, under the Constitution of Minnesota, had no judicial power;

and the judgment is therefore erroneous. *Marberry vs. Madison*, 1 *Cranch* 61 *to* 70; *Hunter's Lessee*, 1 *Wheat.* 330 *side page; In re Booth*, 3 *Wis. R.* 65.

*Second.*—The complaint contained facts which constituted a good cause of action. The judgment of dismissal is therefore erroneous.

*Third.*—The cause was referred to the referee to try the issues of fact joined. Instead of trying the case, he refused to do so, and reported that the action should be dismissed; and such is the judgment. This is a singular proceeding when the Court by the order of reference treated the case as containing issues of fact, and directed that they should be tried. It looks much like the referee reversing the adjudication of the District Court.

*Fourth.*—A material issue was joined by the pleadings, namely: The denial of the allegation of the complaint that the plaintiffs had paid all sums of money and did every other act and·thing which by the condition of the bond mentioned they were bound to do and perform.

*Fifth.*—It is not alleged in the answer that Huff, the attorney, in any particular exceeded his authority in the execution of the bond. It stands, therefore, conceded that he kept within his power, and the issue was whether the plaintiffs had complied with the condition of the bond.

*Sixth.*—Huff, in the execution of this bond, kept not only within the intent of the creator of the power, but within the letter thereof. *Webster's Unab. Dict.* word " *Terms;*" *Worcestor's Large Dict.* same word; *Bouvier's Dict.* same word; *Leroy vs. Beard*, 8 *How. U. S. R.* 466; *Hutchinson et al. vs. Lord*, 1 *Wis. R.* 314; *Keep vs. Sanderson*, 2 *Wis. R.* 42; *Broom's Legal Maxims*, 121, *side, top* 141.

*Seventh.*—A penal bond like the one in question, is as much the subject of specific performance as a formal contract executed by vendor and vendee—the one agreeing to sell and convey; and the other to purchase, pay and take the conveyance. 2 *Story Eq. J. Sec.* 715, *p.* 29.

*Eighth.*—All the rulings of the referee were erroneous; and the judgment entered on his report is erroneous.

Points and authorities of Respondents :

*First.*—That all the acts of Huff charged in the complaint as done, were done solely and exclusively under and by virtue of the letter of attorney set forth, of which Appellants then had notice, and relied on solely, said acts never having been ratified by Respondents otherwise. The Appellants had, and are chargeable with notice of the extent of Huff's authority, and of the fact that he was (at the time of making the alleged trade) exceeding the same. *Story on Agency, Secs.* 73, 76, 83; *Paley's Agency, page* 179, *note* 5; 2 *Kent's Com.* 621; 3 *Hill* 266.

*Second.*—The letter of attorney only authorized the leasing or sale of property in which Orrin Smith on the third day of October, 1853, had a lawful interest.

The title and possession of the property now in controversy was at the time of the delivery of said power, in the United States ; (as the pleadings show) the said power must have been intended to operate upon the " other property of said Smith." *See page* 4, *lines* 37 *to* 41 *Laws of U. S., Act of March 3d,* 1807; *Brightley's Digest,* 487; 1 *Sandford Chy. Rep.* 46.

*Third.*—The letter of attorney did not authorize Huff to bind Smith in a penal bond, nor did it authorize the attorney to bind his principal to execute a warranty deed. *Dunlap's Paley* 181, *note* †; 2 *Vesey* 644, *note* 202; *Dunlap's Paley, note* "*h*" *page* 178 ; 5 *John. Rep.* 58, *Nixon vs. Hyserott;* 2 *Hill* 377.

*Fourth.*—Huff was only empowered to sell for cash, and had no authority to barter or exchange. *Story on Agency, Secs.* 77, 78; *Dart's Vendors and Purchasers, p.* 35; 4 *Greenleaf's Cruise, p.* 180, *Vol.* 2, *p.* 182, 229; *Sugden on Powers, Vol.* 2, *Chap.* 18; 7 *Wend.* 446 ; *page* 455, *note* (1), 3 *Swan's* 699; 3 *Hill* 377; 2 *Sugden on Powers, p.* 480, *Sec.* 49; *Walden vs. M'Comb,* 1 *Hill N. Y.* 114 ; 2 *Paige* 204; 1 *Peters.* 138 ; *Bloom vs. Walden,* 3 *Hill* 361; *Ives vs. Davenport,* 3 *Hill* 376; 4 *Kent's Com.* 331 *and* 334 ; 2 *Kent's Com.* 619, 620; 2 *Vesey,* 644; *Smith on Real and Pers. Prop.,* 261 *and* 262 ; 2 *Swan's* 149.

*Fifth.*—Said attempted execution of said power was a fraud upon Smith, the benefits of the consideration resulting to Ap-

pellants.  Huff and other property holders, Respondents, only owning three-sixteenths of the claim, thereby fraudulently charging three-sixteenths of the property, with the value of the entire benefits to result to the whole.  *Sec. 1 and 2, Chap. 12, Sugden on Powers*; 3 *Hill.* 281.

*Sixth.*—That instead of selling the whole tract or some designated parcel thereof, the alleged contract of sale is for an undivided interest ; the amount of the $600, part of the consideration, did not cover any particular parcel.  The consideration is undivisable, and the whole transaction void.  *Story's Agency, Sec.* 79.

*Seventh.*—The conclusions of the referee are not erroneous, and the judgment of the District Court thereupon should be affirmed.

This action having been referred to H. R. Bigelow, Esq., sole referee therein, it was brought on for trial August 13, 1860.  The Counsel for Respondents objected to the introduction of proof on the part of the Appellants, on the ground that the complaint in the action did not state facts sufficient to constitute a cause of action, and thereupon moved for judgment upon the pleadings.  No material issue being joined, the referee sustained the objection and gave judgment accordingly. Did he err ?  We think a careful examination of the complaint will demonstrate he did not.

It will be observed that the alleged sale is made by virtue of the letter of attorney alone.  The attorney, Mr. Huff, by virtue thereof, only received the amount of the $600 note. The contract has never in any manner been ratified by Respondents, and there is no pretence that Orrin Smith had any notice thereof whatever.

The rights of Appellants, if any they have acquired, depend upon the power alone.  Therefore the execution and delivery of the power, and the fact that Huff assuming to act under and by virtue of it alone, made the bond, being admitted, no proof was necessary.  The issues, if any are made in the pleadings, are " side issues " and wholly immaterial.

The Appellants are chargeable with notice of the contents of the letter of attorney under which Mr. Huff assumed to

act, and of its legal effect. 2 *Kent's Com.* 621 ; *Dunlap's Paley's Agency, p.* 179, *and Story on Agency, Sec.* 73.

The appellants therefore were advised that Huff had a power to sell such land and such only as Smith had a legal or equitable right or interest in on the third of October, 1853, and knew that a conveyance under that power would "relate back to the time of its execution, and would have the same legal effect, and the same effect only as though such conveyance had been embraced in and formed part of the letter of attorney at the time of its execution and delivery in October, 1853. The time intervening between the date and execution of a power can only be considered when the rights of third persons intervene—not for any other purpose.

The lands in controversy were acquired by the United States by virtue of the Treaty at Traverse des Sioux. The date of the acquisition was February 24th, 1853. *Stat. U. S.* 1852 *and* 1853, *page*

Although the pleadings allege that Smith and Johnson had made a claim, yet it is not alleged that Smith by agent or otherwise was in possession. The power only authorized Huff to take possession of such lands as Smith owned, or to which he had at its date an actual interest.

The complaint alleges that after the execution and delivery of the power Huff took possession, and then proceeds to show that by conveyance of Judge Welsh in the last of October, 1855, Orrin Smith acquired certain lots, which lots are within what was called Smith and Johnson's claim.

The title then in 1853 was in the United States, and whatever possessory right Capt. Smith acquired must have been acquired by virtue of a possession or right subsequent to the time of the delivery of the power.

The power shows that Smith resided at Galena, in the State of Illinois, at the time of its execution, he then could not have been "possessed" of the land.

The return of the surveys of the land in question, a public act of which the Court will take judicial notice, was not made, nor were these lands surveyed until long after the date of the power.

Under the Act of March 3, 1807, (*Brightley's Dig. U. S.*

*Stats.*, *p.* 487,) all persons in possession were trespassers ; no valid possessory right could then have been acquired, and the pretended agreement was in violation of law. If so, a Court of equity would not enforce its performance, or a Court of law sustain an action founded thereon.

The premises embraced in the bond are not described with any certainty, and the complaint only attempts to locate them, and only alleges a description, and on information and belief. *Page* 4, *printed case*, *lines* 24 *to* 40 *inclusive*—attempts to describe them. This is not sufficient. When such uncertainty exists, the averments must be positive, or actual possession should be taken under the agreement, with direct reference thereto, and such possession ought to be co-extensive with the contract, and so averred, in order to enable a Court of equity to decree a specific performance.

Again; the pleadings show that whatever right Appellants acquired was prior to the entry of the lands by Judge Welsh, August, 1855. That he gave due notice, and as Appellants relied upon this bond, the legal presumption is Judge Welsh held and decided that Huff had exceeded his powers, that said agreement was void and consequently decided in favor of Respondent. Appellants are concluded by his decision.

The letter of attorney, if of any validity, did not authorize anything more than the ordinary contract of sale ; it cannot be successfully claimed that the execution and delivery of a penal bond was contemplated by the parties ; if not, the agreement by way of condition is void ; nor did the authority authorize Huff to bind his principal to make, execute and deliver " a good and sufficient deed of conveyance"—such deed is well settled to be a deed of general warranty. *Dunlap's Paley*, *p.* 178, *note* "*h* ;" 5 *Johns. Rep.* 58.

If, however, the first, second and third points are untenable, we submit with confidence that the fourth is decisive of this case.

The power in this case is derivative. It is not beneficial to the grantee therein, not a power in trust, and not coupled with any interest in the land; it must therefore be strictly construed, and even a defective execution will not be aided. A sale under this power could only be made for cash—possibly the

attorney might have sold on time, but whether on time or for ready money, it must have been, to be valid, a cash sale. The authorities are uniform, and we think conclusive upon this point. The law upon this point is correctly summed up in *Dart's Vendors and Purchasers of Real Estate, notes by Waterman, p.* 35 : " They must sell for a gross sum of money, unless any other consideration is specially authorized ; for instance, a sale in consideration of a rent charge or annuity is invalid."

A power to sell for a specified sum and upon credit is void if a provision be inserted in the agreement that the $1,000 authorized upon credit should be payable in cash or approved notes. *Ives vs. Davenport,* 3 *Hill,* 374 ; *In Bloomer vs. Waldron,* 3 *Hill,* 367, the Court say, after reviewing the cases and holding that a power to sell does not even authorize a mortgage, that—" When a man directs a sale of his land, whether his object be to raise money or not, he means to put it in market for what it will fetch at the *time,* and avoid the fluctuation of prices."

The power must be pursued with legal strictness, and the agent can *neither go beyond* it nor beside it. The act *done must be legally identical with that authorized to be done or the principal is not bound.*

The bond (*page* 3,) professes to be binding on Smith only, whilst the Appellants are at liberty to comply or refuse to do so, it cannot therefore be called a sale of the property.

And in addition it is an attempt to make Smith, without his consent or privity, become a joint tenant or owner—an authority not given or implied in the power.

The power is " to grant, bargain and sell for such sum or price, and on such terms as to him shall seem meet, and until the sale thereof, to let and demise the said real estate for the best rent that can be procured for the same, and to ask, demand, collect, recover, and receive all *sums of Money* which shall become *due* and owing to me by means of such bargain and sale or lease and demise." There can be no just claim that a power to barter was intended.

*Eighth.*—While courts of justice protect a vendee dealing with an agent, and will not permit the principal to avail *him-*

self to the vendee's prejudice, of instructions given to the agent, not communicated to the vendee, they also see that the rights of the grantor of the power are protected, by holding the vendee bound to see that the power of the agent is not exceeded and requiring the transaction of sale to be made in *good faith* and not surrounded with circumstances tending to impugn the *bona fides* of the transaction. When such circumstances exist, equity will not aid the party thus suspiciously situated.

If therefore the agreement is not absolutely void, did the Appellants, having knowledge of the extent of such power, act in good faith ?

It is evident the money consideration agreed to be paid in view of the admitted value of the land, was *merely nominal.* The nominal consideration is averred (page 5) to have been paid to said Huff, as such Attorney, and for " his use."

The allegation is, " that the Plaintiffs *prior* to the maturity of the said note, duly paid the same to the said Henry D. Huff, Attorney for the said Smith, as aforesaid, and for his use and benefit."

The power did not authorize the Attorney to receive money before it became due.

*Ninth.*—The letter of attorney in this case contained a power to sell only a *part* or *parcel*, or the *whole* land, while the bond contracts an *undivided* interest in a portion of it. *Story on Agency, Section* 228.

The authority to sell an undivided interest in any of said lands is not found in said letter of attorney, unless the same is found and confined by the words " part or parcel ;"—the word " parcel" signifies a description of property formally set forth in a conveyance, together with the boundaries thereof, in order to its easy identification. *Wharton's Law Dic. p.* 734.

If the power applied to the lands, (lots described in the complaint,) property in which we have shown Smith could not have had any interest, and does not apply to other lands which the complaint alleges he did own, then it is clear that it did not authorize a sale of a part of his interest—did not authorize a subdivision. A power of sale will not authorize a partition. The sale of an undivided interest in an undivided

11

interest is going rather beyond any case we have been able to find reported.

The consideration is not divisible, therefore the $600,00 note not being the agreed price of any one or more parcels, or of an undivided fixed portion of the entire interest sold, the rule that the execution of the power shall only be held void for the excess, does not apply.

BERRY & WATERMAN, AND JAMES H. KNOWLTON, Counsel for Appellants.

SMITH & GILMAN, with B. FRANKLIN, Counsel for Respondents.

*By the Court*—FLANDRAU J. This action was tried and decided before a referee to whom it had been committed to hear and determine the whole issues therein. The first objection urged by the Appellants is that the referee had no power under the State Constitution to exercise judicial powers, the language of that instrument being as follows :—" The judicial " power of the State shall be vested in a Supreme Court, Dis- " trict Courts, Courts of Probate, Justices of the Peace, and " such other Courts inferior to the Supreme Court, as the Leg- " islature may from time to time establish by a two-third " vote." *Constitution, Article* 6, *Section* 1. The language of the Constitution is, for the purpose of this question, identical with that employed in the organic act of the Territory which was our Constitution before we entered the Federal Union as a State. *Section* 9 of that act is as follows: " The judicial power of said Territory shall be vested in a Supreme Court, District Courts, Probate Courts, and in Justices of the Peace," &c. Under the organic act, the statute concerning referees was passed in the year 1851, and has been the law of the Territory and the State ever since, without any question of its validity having been made. *Comp. Stats.* 563. Probably there is no act upon the statute book under which more interests have been affected, more rights passed, and property involved, than the statute authorizing the appointment of referees ; under this pressure of great interests, this Court would hesitate long

before it would disturb a statute, unless fully convinced that it was in violation of some substantial provision of the fundamental law, and the very fact that it has so long been acquiesced in by the whole bar of the State, and acted upon without question, would lead us to doubt our own convictions, should an investigation strengthen the point made against its validity.

A referee under our statute is a person appointed by the Court to perform certain offices in the progress of a cause depending in the Court of his appointment, and it may be to try the whole issue. *Comp. Stats.* 563. The intention of the statute is clearly for the convenience of the parties, and the Court, in affording the former a tribunal of their own selection, desirable for purposes of expedition and economy, and in relieving the latter of a vast amount of business which its time and strength are illy competent to entertain and dispose of.

We will now see if the establishment of this officer by the statute to aid the Courts in their labors, is a diversion of the judicial power of the State from its legitimate channels, and a location of it in unauthorized hands. In the first place there is no such officer as a referee permanently attached to a Court. Again, there can be no referee created until there is a cause pending in one of the constitutional Courts, and after his appointment, even if it be to try the whole issue in the cause, it does not take the case out of the Court, but merely calls this officer into the Court to act in the cause in a certain manner, at all times in strict subordination to the Court itself. During the trial of the issue before the referee the cause is as much a cause pending in the original Court as if it was on trial in term before a Jury; and every act done by the referee, is in contemplation of law, as much an act of the Court as if done by the Judge in open term time. The Court speaks and operates through the referee, its subordinate officer. The referee exerts no power *proprio vigore.* Without the Court he could have no existence; without the Court he could not act after his creation; and without confirmation and adoption by the Court, his acts have no force or validity whatever. Nothing can originate before a referee, and nothing can terminate with or by the decision of a referee. The Court acquires the juris-

diction, and the Court renders the judgment upon the controversy, therefore the whole exercise of the judicial power is by the Court, the referee acting only in an intermediate capacity as an auxiliary to the Court in the ascertainment of certain facts and law necessary to its enlightenment in giving the proper decree or judgment.

If the Legislature should attempt to establish independent tribunals and vest them with judicial powers, the constitutional formalities would have to be complied with to give them validity ; but in merely supplying the Courts already established with these necessary and convenient agents or officers, we see no violation of the Constitution whatever.

The respondents object to the sufficiency of the complaint because they allege that at the time the power of attorney was given to Huff, Smith did not own, and could not have owned any land in Fillmore county, the whole of such lands being in the United States. The power of attorney authorizes Huff to " enter into and take possession of all such lands and tene- " ments, hereditaments, and real estate whatever in the county " of Fillmore and Territory of Minnesota, to, or in which I " am, or may be in any way entitled or interested," &c.

This Court will take notice that the treaty under which the lands at that time composing Fillmore county were acquired from the Indians, was ratified by the United States on the 24th day of February, 1853, and we cannot ignore the fact that the treaty was made long anterior to that date, and that many people had entered upon the lands after the treaty, and extensive and valuable interests had grown up thereon, and that the Legislature had recognized and made provision for the protection of such interests ; and that a large proportion of the titles of the State have grown out of the interests then acquired.

As early as 1851, the Territorial Legislature passed an act for the protection of settlers upon the public lands of the United States where settlement was not expressly prohibited by the general government or some department thereof, and allowed an action to be maintained for injuries to such a possession of lands, and to recover the same. *Comp. Stats.*, 654. We are cited to the act of Congress of March 3, 1807, (*U. S.*

*Stats. at large, Vol.* 2. *p.* 445,) to show that the settlement or occupation of lands of the United States of this description was unauthorized and contrary to law. Whether this act embraces acquisitions of territory from Indian tribes is very doubtful; but whether it does or not, it is quite clear that the legislation of Congress subsequently made upon the subject of the settlement of the public lands by individuals with reference to their future acquisition has entirely annulled the effect and obligation of the act of 1807. The pre-emption laws for a long time restricted settlement to the surveyed lands; but the difficulties of such a limitation in a country where the settlement rapidly outrun the tardy movement of the government surveys, soon forced themselves upon the notice of Congress · and resulted in the extension of the rights of pre-emption to all the lands in this State whether surveyed or not, by the act of August 4th, 1854. *U. S. Stats. at large, Vol.* 10, *p.* 576.

This act has always been construed, so far as we have been able to ascertain, not only to permit rights to be acquired upon the unsurveyed lands after its passage, but also to recognize such as had previously accrued. It is clearly such an adoption of such acts by a change of policy, as will effectually prevent a party from defeating an obligation growing out of such rights, on the ground that it was against public policy and public law. The act of Congress of May 23, 1844, under which towns or municipal pre-emptions are settled and entered, goes hand in hand with the agricultural pre-emption laws, and the extention of the pre-emption laws to the unsurveyed lands in Minnesota by the act of August 4th, 1854, carried with it the right to acquire rights upon such lands for municipal, manufacturing and other purposes recognized by the pre-emption laws. *See pre-emption laws of* 1841.

We have held that inchoate interests in town sites by parties occupying them, were such interests as were included within the recording acts, and that conveyances of such interests duly recorded were notice to subsequent purchasers. *Davis & Barnes vs. Murphy,* 3 *Minn. R.,* 119. On page 125, the Court says in speaking of such interests, "This is certainly "an interest in land, inchoate it is true, yet nevertheless

" valuable; and it is authorized by law, and laws are made
" to provide means of perfecting it into a title in fee. It may
" be defended against all encroachments from persons not
" having a paramount right. It is more than a mere right to
" the possession because it contains the germ which will ex-
" pand and ripen into a perfect title."

We have also held that settlements under the act of May
23d, 1844, may be otherwise than in person, and there need
be no cultivation of the soil. Indeed I see no reason why the
occupation of any land in a town site may not be by a person
residing without the State, if he keeps a representative fairly
on the land, by improvement, tenant, or agent. *Leech vs.*
*Rauch,* 3 *Minn. R.,* 448.

In view of the law then, as we understand it, Mr. Smith may
have had very valuable interests in real estate in the county of
Fillmore on the 3d day of October, 1853, the day on which
he executed the power of attorney to Mr. Huff, notwithstand-
ing the land was unsurveyed, and he resided in the State of
Illinois.

In passing to a consideration of the manner in which the
power was executed by Mr. Huff, we will first examine the
power conferred upon him. I cannot see how more forcible
or appropriate words could have been selected to authorize
him to sell and convey by deed of warranty any interest in
real estate that Mr. Smith may have had within the prescribed
limits. The words are, " to grant, bargain and sell the same,
" or any part or parcel thereof, for such sum or price, and on
" such terms as to him shall seem meet, and for me and in my
" name to make, execute, acknowledge and deliver good and
" sufficient deeds and conveyances for the same, either with or
" without covenants, and warranty."

Could he sell for anything but cash? could he sell for any-
thing but money? could he sell an undivided interest? These
questions meet us in the outset, as the attorney sold on time,
and only part of the consideration was in money, and he sold
an undivided interest.

I think it is clear that the words " and on such terms as to
him shall seem meet" following the words 'immediately " for
such sum or price," must refer to such previous words, and

mean the terms upon which the " sum or price" is to be paid. In the case of *Leroy vs. Beard*, 8 *How. Sup. Ct.R. U. S.*, 466, The Court in construing the word " terms" as used in a power of attorney similar in all respects to the one under consideration, use this language. " Terms," is an expression applicable to the " conveyances and covenants to be given, as much as to the amount of, and the time of paying the consideration," and this case holds that the word " terms" in a power of attorney authorized a covenant of warranty in a deed made under the power. We feel clear that Huff was fully empowered to sell on reasonable credit.

The authority to sell and convey on such terms as to the agent should seem meet carried with it a power to receive the purchase money, so that payment of the note to Huff was a good payment to his principal. *Story on Agency, Sec.* 58. *Peck vs. Harriot* 6 *Serg. & Rawle*, 149.

The consideration for which the interest was sold, was six hundred dollars, and the agreement that the purchaser should " open and keep a lumber yard in the village of Winona, Minnesota as soon as practicable ;" and the question is whether the attorney had any right to include anything but money. " The extent of the power is to be settled by the language employed in the whole instrument (4 *Moore* 448,) aided by the situation of the parties and of the property, the usages of the country on such subjects, the acts of the parties themselves, and any other circumstance having a legal bearing and throwing light on the question." *LeRoy vs. Beard*, 8 *How U.S. Sup. Ct. R.* 466.

The record discloses that the claim had been made for the purpose of a town site. The complaint says " That some time thereafter, (after 1851) and before the execution of the aforesaid bond, (contract in suit) the said Johnson and the said Orrin Smith, laid out and platted said land into lots and blocks, and duly filed and recorded the same," &c. The parties were then engaged in the speculation of enlarging the town of Winona, by making additions thereto, as it appears that afterwards this land was entered under the town act as part of the town of Winona. Under these circumstances the power was conferred upon Mr. Huff. The prime object clearly was to

sell the land in a manner that would realize the most money. Not being on the ground in person, Mr. Smith desired to have a representative there clothed with full power to act for him, and seize all the varying chances that those active times might offer, to dispose of on the most advantageous terms, his interest in the town. For this purpose he says his attorney may sell and convey on such terms as to him may seem meet, ask, demand, collect, recover and receive all sums of money that should become due to him for such sales, and have full power and authority to do, and to perform ᴿall and ╎every act and thing whatsoever requisite and necessary to be done in and about the premises as fully to all intents and purposes, as he might or could do if personally present.

This language is very broad, and if we confine it as we must to those matters "requisite and necessary" to carry out the main object of the power, which is the advantageous sale of the land, still we would have to ignore the promptings of our own senses, and our knowledge of the manner of transacting such business, if we should hold that the provision for establishing a lumber yard in the town was without the spirit and meaning of the power. There is nothing more common than the insertion, in conveyances of land, or interests in town enterprises, of a provision that the purchaser shall improve the land sold, or adjacent lands, to enhance the value of the remaining lands of the grantor, and render them more saleable. The stipulation for the establishment of a lumber yard in a young and growing town was one evidently designed to raise the value of the remaining lands of the seller; and the fact that it might and would at the same time increase the value of the lands owned by the agent Huff or any other citizen of that place, can in no manner affect the question of its value to the grantor Smith, unless it is shown to operate so unjustly as to be a fraud upon the rights of Mr. Smith. We think the consideration for which the interest was sold was fully justified by the power; its inadequacy is not raised.

The same remarks which have just been made concerning the aids a Court may use to throw light on the instrument it is called upon to interpret, are applicable to the question whether the power authorized the sale of an undivided inter-

est. In such cases the nature of the subject contemplated in the power of attorney to be bought or sold, will very materially affect the execution of the power. For instance, if the power should authorize the agent to buy one hundred bales of cotton for his principal, and he should purchase fifty from one man, and fifty from another at different times, or if he should buy fifty only, being unable to purchase any more at any price, or at the price limited, the power would be well executed as a general rule. *Story on Agency, Sec.* 170. *Livermore on Agency, Chap.* 5, *Sec.* 1, *p.* 99—100. So if A should consign a cargo of goods to B to sell; there can be no doubt that B. might sell different parcels thereof to different persons, and at different times, and the sales would be held, by implication, fairly within the scope of the authority. *Story on Agency, Sec.* 180. But if the authority was to buy or sell a ship, or a plantation, it would not be well executed by the purchase or sale of a part of either. *Story on Agency, Sections* 171, 180. And why would such opposite constructions be placed upon the same words in different instruments? The answer is, simply because the power in each case must be interpreted with relation to the subject matter it treats of and is to operate upon. Let us now examine the subject matter of the power in this case. The complaint shows that some time between the year 1851 when the claim was made, and the 16th of April, 1855, the date of the execution of the contract in suit, the land was laid out into blocks and lots, and a map made of it and filed and recorded. That at the time the Judge entered the land at the United States Land Office, which was the last of October, 1855, only a few months after the contract to the Plaintiffs had been executed, " the claim was considered as divided into sixteen shares, of which the said Orrin Smith claimed to be the owner of four sixteenths, including the one sixteenth which by the terms and conditions of said bond he had agreed to convey to the plaintiff in this action," &c. Now these allegations, together with the fact that the agent sold one sixteenth of the claim to the plaintiffs, leaves it past any doubt that at the time of the sale, the claim had been divided into these sixteenth parts, and that such division was made or assented to by Smith; be-

cause he had in some way disposed of four of the shares, and claimed the remaining four from the Judge after the entry of the land, one of which four the plaintiff alleges was the one he had previously agreed to sell and convey to him. These facts being fairly disclosed by the complaint, (and for the purposes of this inquiry they must be taken as confessed) it seems to come with a bad grace from Mr. Smith, after placing his property in this peculiar situation, to object, that his agent upon whom he had conferred such ample powers, should make a sale of one of the very divisions or parts into which he had separated it, and had been himself disposing of it. It is but a fair construction to place upon the acts of the parties, to say that the division of the claim into sixteenth parts was to meet the provision in the power of attorney ˝allowing the agent to sell " any part or parcel" of the property. The power was on record for the inspection of the world, and had in no manner been revoked or annulled ; purchasers therefore had a right to regard it as continuing, and to examine its terms as applied to the lands as they were at the time of the purchase, and not as they were at the date of the power. If any subsequent change in the condition of the lands would affect the powers of the agent, the principal should make a corresponding alteration in the power or revoke it ; if he allows it to remain, he will be bound by any act that is justified by its terms at the time the act is performed.

The complaint is good, and there must be a new trial.

*Emmett, Chief Justice, dissents.*

NOTE. A motion for a re-argument of this case was denied at the July Term, 1861.